In The

## *Court of Appeals*

## *Ninth District of Texas at Beaumont*

_____

### NO. 09-22-00392-CV
_____

### IN THE INTEREST OF K.R.K.-L.H.

**On Appeal from the County Court at Law No. 2
Liberty County, Texas
Trial Cause No. CV2016063**

### OPINION

Mother appeals from an order terminating her parental rights to *Karl* (K.R.K.-L.H.), her twenty-three-month-old son.[1] In the same proceeding, the trial court terminated the parental rights of B.H. Jr., Karl's father, to Karl.[2]

Mother raises two issues in the brief she filed to support her appeal. In issue one, Mother argues the trial court erred in admitting records into

---

[1] To protect the identity of the minor, we use pseudonyms to refer to the child and the members of his family. *See* Tex. R. App. P. 9.8(b)(2).

[2] B.H. Jr. and Mother were married. Unlike Mother, B.H. Jr. didn't appeal from the trial court's order terminating his parental rights.

1

evidence during the trial, which the Department of Family and Protective Services used to prove Mother tested positive for illicit drugs on several drug tests proven up with a business records affidavit signed by a records custodian employed by the Texas Alcohol Drug and Testing Service. In issue two, Mother argues the evidence is legally and factually insufficient to support the trial court's finding that terminating her parent-child relationship with her child is in Karl's best interest. Because we conclude Mother's issues lack merit, we will affirm.

Background

Karl was born in March 2020. Four days later, Tyiesha Justice, an investigator employed by the Department of Family and Protective Services, Child Protective Services Division, received a report that there was "Neglectful Supervision of [Karl] by his mother[.]" Justice found Karl in the hospital, but his mother was not there. Justice told the trial court that under the circumstances, she "took custody of the child and placed the child in foster care."

A few days later, Justice located Mother in Santa Maria, a rehab facility in Harris County. When Justice met Mother there, she told Justice that she had been using meth since she had been eighteen-years

2

old. Mother, however, denied having using drugs in the past six months. But Mother then contradicted herself, as according to Justice, Mother told her she had eaten "methamphetamines so that she [could be] accepted into the program. And then she also admitted that she had taken four opiate pills to relieve some pain, some like back pain issues that she was having while she was pregnant."

Hair samples, which Mother submitted to the Department for testing on April 6, 2020, tested positive for meth. When the Department got the results of the test the next day, it sued Mother and B.H. Jr. (Karl's father), seeking to protect Karl by establishing a conservatorship and to terminate the existing parent-child relationships between Karl and his parents. When the Department filed suit, it already had open cases against Mother involving two of her other children, *Bobby* and *Lacy*. In September 2020, just five months after launching the formal proceedings that led to the order terminating Mother's parental rights to Karl, the 253rd District Court of Liberty County signed a final order terminating Mother's parental rights to Bobby and Lacy.

Turning to the evidence Mother complains about in the trial of the case at issue here, Mother's evidentiary objections focus on the trial

3

court's ruling admitting Exhibit H. Exhibit H contains the results of the testing done on urine and breath specimens that Mother submitted for testing at the Department's request. The following chart, which we have prepared, summarizes the results of the tests in date order:

| Date | Specimen | Result |
|---|---|---|
| April 2020 | Urine | Neg. |
| April 2020 | Hair | Pos./Meth. |
| June 2020 | Urine | Neg. |
| June 2020 | Hair | Neg. |
| December 2020 | Hair | Pos./Meth. |
| December 2020 | Urine | Neg. |
| January 2021 | Urine | Pos./Barbiturates, Benzodiazepines |
| March 2021 | Urine | Neg |

The testimony the trial court heard about Mother's drug use, however, was not restricted to the information in Exhibit H. Eleven witnesses testified in a hearing before an associate judge. That hearing ended when the associate judge signed an order terminating Mother's

4

and Father's parental rights to Karl. The witnesses who testified in the hearing before the associate judge were: (1) Mother; (2) the investigator employed by the Department in charge of the investigation the Department conducted in Karl's case, Tyiesha Justice; (3) the custodian of records for the Harris County Hospital District, Jacqueline Jefferson; (4) *Tina*, an adoptive parent of another of Mother's daughters, *Ruth*; (5) Carole Karachiwala, a caseworker formerly employed by Child Protective Services (the caseworker assigned by the Department to work on the cases that involved Bobby and Lacy); (6) *Mary*, Tina's daughter, whom the trial court named in the order terminating Mother's parental rights to be one of Karl's joint managing conservators; (7) *John*—Mary's husband—whom the trial court named as Karl's other joint managing conservator; (8) Karl's Court Appointed Special Advocate (CASA); (9) Traci McMurtry, Mother's recovery coach; (10) Sarah Cross, who testified she lives in a house near the house where Mother was living when the hearing before the associate judge occurred, and who testified that Mother lives with a man named Wade Morgan; and (11) *Brenda*, Karl's maternal grandmother, who testified that she is currently responsible for taking care of four children in her one-bedroom home and that she knows

5

Wade Morgan, but she doesn't believe it would be appropriate to have children in his presence.

Importantly, we note that in this appeal Mother hasn't challenged the trial court's findings of condition endangerment, conduct endangerment, or its finding that her parent-child relationship had been terminated in a prior proceeding on grounds of endangering a child.[3] Instead, Mother argues the evidence is insufficient to support the trial court's best-interest finding, pointing to her testimony that she "has been clean since May 2019."

To support her argument that the trial court's best-interest finding is not supported by sufficient evidence, Mother points to the parts of her family service plan that she completed, suggesting the trial court should have relied on her testimony rather than the evidence presented by the Department in determining whether allowing her to retain her rights to Karl would be in Karl's best interest. As Mother would have it, the trial court should have believed her testimony that she now has the skills she needs to "keep going to church and keep going to classes[,] I mean, going

---

[3]See Tex. Fam. Code Ann. § 161.001(b)(1)(D) (condition endangerment), (E) (conduct endangerment), (M) (had her parent-child relationship terminated on an endangerment finding as to another child).

to work and just carrying a good lifestyle for me and my son." In the Department's view, however, Mother's longstanding history with the Department, a history that involves a prolonged substance abuse history involving methamphetamines, makes Mother unsuitable to parent a child.

At trial, the Department established that Mother's parental rights to Ruth, Bobby, and Lacy had been terminated in prior proceedings through two court orders. Copies of the orders terminating Mother's rights in those proceedings were admitted as exhibits in the proceeding involving Karl. As to Ruth, the order terminating Mother's rights shows the court terminated Mother's parental rights in that proceeding on predicate findings of abandonment, conduct endangerment, and for failing to support Ruth.[4] And as to Bobby and Lacy, the order reflects Mother's rights were terminated on two predicate grounds, her failure to comply with her family service plan and a finding that her rights had

_____

[4]The trial court's order in the suit that involved terminating Mother's rights to Ruth, which was admitted into evidence in the trial of the proceeding that involves Mother's rights over Karl, shows that Mother was served with citation in the suit to terminate her parental rights to Ruth but that she never appeared.

been terminated on grounds of endangerment in a prior case that involved another child.

As mentioned, Tina was one of the witnesses who testified in the hearing conducted before the associate judge. Tina explained that she is Karl's father's aunt (Karl's great aunt). According to Tina, Ruth was placed in her care after the Department (Child Protective Services) removed Ruth from Mother's and Father's home. Tina added that after Mother's rights to Ruth were terminated, she sought to adopt Ruth. According to Tina, when the adoption case was going to court, Mother threatened her and made terroristic threats. Tina explained that currently, Karl is living in the home of her daughter (Mary) based on his placement. Tina explained that one of the advantages of that placement is that Karl gets to see Ruth (his sister) at Mary's home every day. Tina added that Karl and Ruth appear bonded, "love each other[,] and [t]hey play hard."

Carole Karachiwala, the Department's caseworker, developed a family service plan for Mother in Karl's case. The plan required a drug and alcohol evaluation. At trial, Mother admitted having used "illegal drugs" during her pregnancy with Karl, claiming she did so to be

admitted into the facility at Santa Maria Hostel so she could be "stable enough to take care of my son." Even though Mother testified the Santa Maria Hostel required a failed drug test as a condition to admission, its former employee Tracy McMurtry (Mother's recovery coach at Santa Maria) testified that "you have to be positive to get into detox services, but not . . . just to get into treatment."

The trial court heard testimony that Mother went into treatment programs many times but never successfully completed a program. Mother's own testimony confirmed she didn't complete a drug-treatment program, as she testified in the hearing conducted by the associate judge that she was kicked out of the facilities she attended. Even so, Mother also testified in that hearing that she had maintained her sobriety and been free from drugs from a period of twelve to eighteen months.

The Department's caseworker, Karachiwala, testified that in her time with the Department, Mother failed to comply with requests for drug screens "twice a month every month, from June of 2019 until April [2021]." Other witnesses — Tina, Mary, John, and the CASA — told the trial court that they believed that Mother was still using drugs.

The evidence in the trial also shows that Mother moved often during the time Karl's case was pending on the trial court's docket. In the eighteen months the case was on the docket, Mother lived at the Santa Maria Hostel, with her mother Brenda, in several hotels, at the Brazos Place (another rehab facility), at a Christian-based facility in Hitchcock, and at a residence on K Street. As to the K Street residence, Mother testified she leased the residence with money she received on loan from "an 80-year-old retired CPA," whom Mother described as a close friend.

During the hearing before the associate judge, Mother admitted she was friends with a registered sex offender named Wade Morgan. Mother, however, denied that she and Wade Morgan were romantically involved, Mother told the trial court that she could keep Karl away from Morgan. But there was other testimony in the trial contradicting Mother's account about her relationship with Morgan. According to Tina, Karl's father (Mother's husband) told her that Mother and Morgan "were in a romantic relationship." And Sara Cross, Mother's neighbor, testified that Mother introduced Wade to her as her husband. Cross added that she had seen children at Mother's residence when Wade was there.

The evidence before the associate judge included testimony relevant to Karl's current placement with his foster parents and his development, as the associate judge heard evidence that Karl has bonded with Mary and John. The testimony shows that Karl has been in the placement with Mary and John for about a year. Mary described Karl as a "very funny, happy baby. He's silly, he's smart, he's sweet, he's just great." According to Mary, Karl is meeting his developmental milestones. John testified that Karl is "very much" thriving in their home. Both Mary and John testified they were bonded with Karl; for instance John described his bond with Karl as "[l]ike he's my own." Mary and John added that they have the resources, support, and ability to provide Karl a safe, stable home.

Mary and John asked the trial court to terminate Mother's parental rights. The CASA recommended Mother's rights should be terminated too, citing Mother's instability, lack of support, lack of financial stability, and association with a registered sex offender. The CASA stated she had no concerns about Mary's and John's ability to meet Karl's needs. Karachiwala (the Department's caseworker) testified that in her opinion,

11

it was in Karl's best interest for the court to terminate Mother's parental rights.

On the other hand, Mother asked the court to return Karl to her. She told the court that she has a room for Karl, which is ready for him in her home. As to her plans for Karl, she plans to put him in daycare or with Brenda (her mother who is caring for four other children in a one-bedroom home) when she's at work. Mother claimed to have family, friends, and members of a church who would help support her.

At the end of the trial before the associate judge, the associate judge signed an order terminating the parent-child relationship between Mother, Father, and their son Karl. Then, Mother requested a de novo hearing in the referring court, complaining about that ruling made by the associate judge.[5] Mother requested the de novo hearing on two issues: (1) "Termination of [Mother's] parental rights;" and (2) "the Appointment of [Mary] and [John] as joint managing conservators."

---

[5]*See id*. § 201.15(a). The court that referred the case to the associate judge was the 253rd District Court of Liberty County, Texas. After Mother filed her request for a de novo hearing, the case was transferred from the 253rd District Court to the Liberty County Court at Law Number 2. No one has challenged the validity of the order signed by Judge Thomas Chambers on November 16th ordering the case transferred to the Liberty County Court at Law Number 2.

The County Court at Law Number 2 conducted the de novo hearing in February 2022. The judge advised the parties that it would consider the Reporter's Record from the hearing conducted by the associate judge in its review. Mother also asked the judge to allow her to call one witness, Stephanie Cole, in the de novo hearing. The trial court agreed it would allow Mother to call Cole. While Cole didn't testify in the hearing before the associate judge, she is the person who signed the affidavit for the Texas Alcohol and Drug Testing Service as the custodian of the business records, the records that were marked and admitted as Exhibit H during the initial hearing.

Turning to testimony of the additional witness in the de novo hearing, Cole testified she works for the Texas Alcohol and Drug Testing Service (TADTS) as its custodian of records.[6] She explained she is the person who signed her name to the affidavit attached to the records in the exhibit marked as Exhibit H. Cole agreed that she could not testify to the exact chain of custody for the drug test results in the TADTS's

---

[6]Cole's affidavit reflects the name of the business is Texas Alcohol & Drug Testing Service, Inc.

records, however, because she only keeps track of the records and does not collect the biological specimens, which TADTS tests.

According to Cole, the actual testing of the biological samples is performed by an outside lab, Quest Diagnostics, which is not part of the TADTS's facility. The outside lab is responsible for calibrating their equipment, and Cole agreed that she cannot attest to the machines that Quest uses or the accuracy of Quest's machines. Cole agreed that she could not testify about the qualifications of the persons at Quest who had performed the tests on Mother's biological specimens. As the custodian of TADTS's records, Cole explained, she was testifying that the records attached to Exhibit H are the records TADTS's keeps in the normal course of its business.

In closing argument, Mother's attorney argued that Exhibit H was inadmissible "as hearsay and there's a lack of proper foundation . . . [because Cole] was not qualified to testify as to the standard of testing, the qualification of these people who administer the test, the type of test." Mother's attorney agreed that Mother was not claiming Exhibit H is not a business record; instead, she explained she was objecting to Exhibit H

because the Department (according to Mother's lawyer) had not shown the drug test results in the records are reliable.

Nine months later and after the trial court overruled Mother's objection to Exhibit H, the County Court at Law Number 2 signed a final order terminating Mother's and Father's parental rights to Karl. The trial court's final order terminates Mother's parental rights on the predicate grounds of condition endangerment, conduct endangerment, and a finding that she had her parent-child relationship terminated in a prior case for having endangered another child.[7] The trial court also found that terminating Mother's parental rights to Karl is in Karl's best interest.[8] In the final order, the trial court appointed Mary and John as Karl's joint managing conservators.

## Standard of Review

Mother's first issue challenges the trial court's ruling admitting Exhibit H. On appeal, a trial court's ruling to admit or exclude evidence

---

[7] *See id*. § 161.001(b)(1)(D), (E), (M). B.H. Jr.'s (Father) rights were also terminated by the trial court's final order. But B.H. Jr. neither appealed from the trial court's final order, nor did he request a de novo hearing from the associate judge's order. Both orders terminate B.H. Jr.'s parental rights to Karl.

[8] *Id*. § 161.001(b)(2).

is reviewed for abuse of discretion.[9] A trial court abuses its discretion when it acts without regard to the guiding rules or principles governing the admission of evidence, or if its decision to admit or exclude evidence is shown to have been arbitrary or unreasonable.[10]

In Mother's second issue, Mother argues the trial court's best-interest finding is not supported by sufficient evidence. In a suit filed by the Department to terminate the parent-child relationship, the Department must prove by "clear and convincing evidence" that terminating the parent-child relationship is in the child's best interest.[11] As defined by the Family Code, clear and convincing evidence "means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."[12] When the parties try a case to the bench, the trial court is the factfinder and decides which witnesses were credible, how much weight to give to each witness's testimony, and it resolves any

---

[9]*In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005).

[10]*See Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985).

[11]Tex. Fam. Code Ann. § 101.007.

[12]*Id.*

inconsistencies or conflicts in the evidence admitted before it in the trial.[13]

Under a legal-sufficiency review, we determine whether "a reasonable trier of fact could have formed a firm belief or conviction that its finding was true."[14] In reviewing the evidence, we "look at all the evidence in the light most favorable to the finding," "assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and "disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible."[15] In conducting our review, we will not disregard "undisputed facts that do not support the finding" a party has challenged in the appeal.[16] When deciding whether a reasonable trier of fact could have formed a firm belief or conviction that the evidence supports a finding, we defer to the factfinder's role as the "sole arbiter of the witnesses' credibility and

---

[13]*In the Int. of D.P.*, No. 09-22-00480-CV, 2022 WL 2975691, at *7 (Tex. App.—Beaumont July 28, 2022, pet. denied).
[14]*In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002).
[15]*Id.*
[16]*Id.*

demeanor" when the inferences it drew from the evidence before it were reasonable.[17]

In a factual-sufficiency review, we "give due deference" to the findings that depend on the direct and circumstantial evidence admitted before the factfinder in the trial.[18] Under a factual sufficiency review, the question we must decide is not what we would have found from the evidence in the trial had we been the factfinders in the trial.[19] Instead, the question is whether from the evidence as a whole the factfinder could "reasonably form a firm belief or conviction about the truth of the [Department's] allegations."[20]

To support her argument that the evidence is factually insufficient to support the trial court's best-interest finding, Mother needed to explain why the evidence in the trial did not allow the trial court to infer that terminating her parental rights to Karl is in his best interest.[21] When we review the evidence the trial court considered, we will not find

---

[17]*In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021); *see In re J.W.*, 645 S.W.3d 726, 741 (Tex. 2022).
[18]*In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (cleaned up).
[19]*Id.*
[20]*See In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002).
[21]*See In re J.F.C.*, 96 S.W.3d at 266.

the evidence factually insufficient to support the best-interest finding Mother has challenged unless "in light of the entire record" and the evidence the trial court "could not have credited in favor of the finding is so significant" that the trial court "could not reasonably have formed a firm belief or conviction" favoring the finding that it made.[22]

In evaluating the factors that a trial court considers in reaching a best-interest finding, the inquiry is necessarily child-centered and focuses on the child's well-being, safety, and development.[23] Generally, when examining the evidence supporting the finding, we compare the evidence admitted in a trial against the nonexclusive factors the Texas Supreme Court identified in *Holley v. Adams*.[24] Still, the factors mentioned in *Holley* aren't exclusive, and the evidence tied to a factfinder's normal decision-making process in determining what's in a child's best interest need not include evidence addressing all eight *Holley* factors.[25]

---

[22]*Id.* at 267.

[23]*See In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018).

[24]*See Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

[25]*In re C.H.*, 89 S.W.3d at 27 (noting the lack of evidence on some *Holley* factors "would not preclude a factfinder from reasonably forming a strong belief or conviction that termination is in the child's best interest").

As a result, when probative, evidence on one of the more than twenty-one predicate grounds for terminating a parent's rights may reinforce a trial court's best-interest finding.[26] That's often the case when the trial court is acting as the factfinder and has found the parent endangered the child.[27] As then Chief Justice Jefferson writing for the Texas Supreme Court explained in *In re C.H.*: "The absence of evidence about some of these considerations would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest, particularly if the evidence were undisputed that the parental relationship endangered the safety of the child."[28]

## Analysis

### *The Ruling to Admit Exhibit H*

On appeal, Mother argues that the trial court abused its discretion in admitting Exhibit H because the exhibit contains "drug test results without anyone to testify" about the "qualification[s] of the tester, the equipment used, and the testing procedures amounted to an abuse of discretion."

---

[26]*Id.* at 27-28.
[27]*Id.* at 27.
[28]*Id.*

20

The lab reports that Quest sent to the TADTS are among the records in Exhibit H. Some are positive for the presence of meth. Quest's reports are tied to specimens that TADTS collected from Mother and then submitted and processed at Quest's "DHHS CERTIFIED LABORATORY," based on the information found within Quest's reports

While Quest's lab reports do not include a definition of the term "DHHS Certified Laboratory," all the Quest reports show that Mother's samples were tested in a DHHS Certified Lab.[29] When the trial court ruled on Mother's objection to Exhibit H, we assume the trial court noticed that fact, and that the trial court also would have known that "DHHS" stood for the Department of Health and Human Services. A DHHS Certified Lab subject to the Department of Health and Human Services' certification program for drug testing involves entities and individuals engaged in interstate commerce subject to federal law.[30] We presume the trial court knew what the meanings of the terms were in the

[29]Cole was also not asked to address whether she knew what a DHHS Certified Lab was when she testified in the de novo hearing.
[30]*See* 49 C.F.R. pt. 40 (Procedures for Transportation Workplace Drug and Alcohol Testing Programs); *see also* 49 C.F.R. § 49.81 (What laboratories may be used for DOT drug testing).

21

drug testing records and applied them when deciding whether the records should be admitted into evidence in the trial.[31]

The evidence that the lab results came from a DHHS certified lab is circumstantial proof that shows the lab that tested Mother's drug samples was certified to test for five classes of drugs, including amphetamines like meth.[32] DHHS certified labs are also required to run tests to determine the validity of the tests they perform in their labs.[33]

In addition to the Quest Lab reports, Exhibit H includes reports signed by Dr. David Nahin interpreting the results of the testing on Mother's specimens. Dr. Nahin's reports reflect that he is a "Certified Medical Review Officer." Even though the term Certified Medical Review Officer (MRO) is not defined in Dr. Nahin's report, we presume that the

---

[31]*Walton v. Arizona*, 497 U.S. 639, 653 (1990) ("Trial judges are presumed to know the law and to apply it making their decisions."), overruled on other grounds by *Ring v. Arizona*, 536 US. 584, 589 (2002); *Ellis v. Dall. Area Rapid Transit*, No. 02-19-00224-CV, 2021 Tex. App. LEXIS 327, at *14 (Tex. App.—Fort Worth 2021, pet. denied) ("Absent conclusions of law to the contrary, we presume the trial court knew and correctly applied the law to the facts."); *Buckeye Ret. Co., L.L.C. v. Bank of Am., N.A.*, 239 S.W.3d 394, 402 (Tex. App.—Dallas 2007, no pet.) ("Further, we presume the trial court knew and correctly applied the law regarding spoliation and determined that if the presumption applied, it was overcome by the evidence.").

[32]49 C.F.R. § 40.85(c).

[33]49 C.F.R. §§ 40.89, .91.

trial court would have known that federal law requires an MRO to be a licensed physician and to have training in collection procedures for urine specimens, chain of custody, reporting, recordkeeping, interpretation of drug and validity of test results, and the role and responsibilities of the MRO in the Department of Transportation drug testing program.[34]

The Department introduced Exhibit H under Texas Rule of Evidence 902(10) as business records accompanied by a business records affidavit. Under that rule, records are self authenticating if the original or copy of the records attached to the affidavit meet the requirements of the business exceptions rule, Texas Rule of Evidence 803(6).[35] On appeal, Mother points to no defects in the business records affidavit signed by Stephanie Cole. Boiled down, Mother's argument is whether the Department proved the results of her drug tests, shown in the reports attached to Cole's affidavit, are reliable. Mother has not argued or claimed the reports attached to Cole's affidavit are not authentic.

That said, once the Department established the records were authentic, which Mother doesn't dispute, the burden of proof shifted to

---

[34]49 C.F.R. § 40.121 (Who is qualified to act as an MRO?).
[35]Tex. R. Evid. 902(10); *id*. 803(6).

23

Mother under the business records exception to prove the source of the information, the method the records were prepared, or the circumstances behind them "indicate[d] a lack of trustworthiness."[36] Mother didn't call any witnesses to meet her burden. She doesn't point out any problems with the records themselves, for example by explaining how a drug test in a given report was internally inconsistent with the other parts of the report. Instead, what she claims is that after the Department presented the trial court with authentic certified records of Mother's drug test results the Department should have done more to prove the results were accurate. But Mother's problem is that once the records are proven to be authentic, the burden shifted to her to establish the records were untrustworthy.

We have no such evidence the records are not trustworthy here. For example, there is no testimony in the record showing: (1) the testers who performed the tests were not qualified; (2) the equipment used to perform the tests provided the individual who performed them with less than accurate results; (3) the individuals who performed the tests were not properly trained to perform the tests; or (4) the individuals who

---

[36]*Id*. 803(6)(D).

performed the tests reflected in the reports failed to follow the proper testing procedures when they performed the tests that are reported.[37] Instead, the only evidence before us about the source of the reports comes from Stephanie Cole, whose testimony shows the records were made, kept and maintained as business records of the Texas Alcohol and Drug Testing Service, and there is nothing in Cole's testimony that shows Mother's biological specimens were gathered, sampled, or tested improperly. As Cole told the trial court in the de novo hearing, "[t]he only thing I do is I pull records and keep track of records. That's all I do."

Of course, had Mother wanted to understand how the samples were gathered and the testing performed, she could have taken the deposition or subpoenaed Dr. David Nahin for the trial. His name is on the reports, so Mother knew he was the MRO and was on notice that he is the person who had the training and qualifications required to provide the answers to her questions about the chain of custody procedures followed by TADTS. But once the Department met its burden by establishing that records it wanted to introduce met the business records exception of Rule

---

[37]*Id*. 803(6) (providing that records of regularly conducted activities —often called business records — are "not excluded by the rule against hearsay regardless of whether the declarant is available as a witness").

25

803(6)(A-D), the burden under Rule 803(6)(A-D) shifted to Mother as the party opposing the admission of the records to show the information in TADTS's records was untrustworthy.

We conclude the Department's business records affidavit complied with Rule 803(6)(A-D). We further conclude Mother failed to meet her burden of introducing evidence rebutting the prima facie evidence presented by the Department through its records custodian that the Quest records were authentic, and that they were created and maintained in the regular course of business.[38] Accordingly, Mother failed to introduce evidence sufficient to demonstrate the source of the information or the method or circumstances of preparing the reports indicate a lack of trustworthiness.

Last, we note we have rejected similar arguments on claims about similar drug-testing records three times in the past twenty-seven months. Mother failed to cite or distinguish these cases in her brief.[39] Mother's first issue is overruled.

---

[38] *Id*. 803(6)(E).
[39] *In re S.J.*, No. 09-22-00305-CV, 2023 Tex. App. LEXIS 513, at *39 (Tex. App.—Beaumont Jan. 26, 2023, no pet.) (mem. op.) (holding trial court did not abuse its discretion in admitting DHHS Certified lab reports, which were accompanied by business-records affidavits); *In re*

*The Best Interest Finding*

In Mother's second and last issue, Mother seeks to overturn the trial court's best-interest finding. That said, Mother hasn't challenged the trial court's predicate findings that she engaged in conduct that endangered Karl, allowed him to remain in conditions or surroundings that endangered him, and that she had her parent-child relationship with another child terminated in another case on a finding that she had endangered that child.[40] Instead, she argues the evidence is insufficient

_____

*O.G.H.D.*, No. 09-21-00172-CV, 2021 Tex. App. LEXIS 8002, at *21-23 (Tex. App.—Beaumont Sept. 30, 2021, no pet.) (mem. op.) (holding no abuse of discretion occurred in admitting DHHS Certified lab report of drug testing based on business-records affidavit of the Texas Alcohol and Drug Testing Service); *In re J.N.P.*, No. 09-20-00245-CV, 2021 Tex. App. LEXIS 1827, at *21-22 (Tex. App.—Beaumont Mar. 11, 2021, no pet.) (mem. op.) (holding that the trial court did not abuse its discretion in admitting drug testing records maintained by the Texas Alcohol and Drug Testing Service as business records because the trial court "could have concluded that the affidavit by the custodian of records for the [business] was sufficient for the business-records exception").

We note the attorney who represented Mother on appeal was not one of the attorneys involved in the above three cases. Still, we would be remiss were we not to mention that we expect that appellate lawyers, when briefing their arguments, to "advise the Court of controlling legal authorities, including those adverse to their position[.]" https://www.txcourts.gov/media/1437423/standards-for-appellate-conduct.pdf (Texas Supreme Court, Standards for Appellate Conduct, Lawyers' Duties to the Court).

[40] *See* Tex. Fam. Code Ann. § 161.001(b)(2); *id*. 161.001(b)1)(D),(E), (M).

27

to overcome the presumption under the Family Code that appointing her child's joint-managing conservator is in the child's best interest.[41]

To support her argument that now, she is free from what has been a repeated historical pattern of drug-use involving meth, Mother relies on her own testimony that she acquired the skills she needs to overcome her methamphetamine abuse problem that has plagued her in the past. Mother suggests the associate judge and the trial court should have believed her when she testified that "May 20, 2019 was the last time" she "did any type of drugs[.]" Mother adds that in evaluating her testimony, the factfinder in the hearing should have believed her testimony when she said she intends to maintain "a good lifestyle for me and my son[,]" and when she testified that after Kyle's birth, she had attended drug and alcohol assessments, a psychiatric evaluation, drug evaluations, individual counseling, and a parenting course. Yet the only exhibits Mother introduced supporting her claim that she completed counseling consists of a certificate showing she completed a four hour parenting education and stabilization course and an AA/NA attendance log, a

---

[41]*Id.* § 153.131(b); *see also In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (nothing that a "strong presumption" exists in keeping a child with its parents).

28

document that Mother claims shows she attended AA/NA meetings in a four-month period between June and September 2021.[42]

As mentioned, the trial court's findings that Mother endangered Karl are undisputed. In her brief, Mother hasn't explained why the trial court's endangerment findings alone aren't sufficient to support the trial court's finding that terminating her parental rights to Karl is in Karl's best interest. While we could stop there and affirm the trial court's order, we note that in deciding whether it would serve Karl's best interest to terminate Mother's parental rights and appoint Mary and John as Karl's joint-managing conservators, the trial court had a right to consider past conduct toward her other children and toward Karl.[43]

As to Mother's other children, Mother provided the Court with no argument to explain why the associate judge and the judge that conducted the trial de novo could not have reasonably inferred that when Karl was born, Mother had a ten-year history of using illicit drugs. As to Karl and based on the drug test results in Exhibit H, the evidence before

---

[42]Even though Mother testified she attended the AA/NA meetings between June and September, nothing in the log the AA/NA group kept for the meetings contains Mother's name or verifies Mother's attendance.
[43]*See In re C.H.*, 89 S.W.3d at 27-28.

us shows that it was reasonable for a factfinder to infer that after Karl was born and Mother knew her parental rights to him were at stake, Mother still chose to keep using meth. The tests in the record show that Mother tested positive for amphetamines, methamphetamine, barbiturates, and benzodiazepines after the Department removed Karl from Mother's care. As the factfinder, the trial court also had the right to conclude that Mother never successfully completed a drug rehabilitation program since Mother never provided the trial court with any objective evidence of completing outpatient or inpatient treatment and agreed that she enrolled in and failed to complete rehab in three programs. Even if the trial court believed Mother's conduct had improved after Karl's birth, the trial court was not required to weigh the evidence Mother presented of her recently improved conduct more heavily than the evidence it heard about her parenting abilities from the time she was eighteen, as that history shows she had a longstanding and untreated drug problem that had already led to the termination of her parental rights to three children before Karl.[44]

---

[44]*See Interest of J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009); *In re C.H.*, 89 S.W.3d at 28.

Finally, the trial court was also entitled to consider Mother's plan—to have Karl live with her and her mother, who was responsible for the care of four children in a one bedroom home—as compared to the plans of the Department, which was to allow Karl to remain in his current placement in a foster home. The trial court heard testimony that Karl is living with Mary and John, his foster parents, who are meeting his physical and emotional needs. The foster parents testified they wanted to adopt Karl. Karachiwala (the Department's caseworker), the CASA, and Mary, offered opinions that terminating Mother's parental rights would be in Karl's best interest. Finally John, describing his bond with Karl, testified: "Like he's my own[,]" and that if Mother's and Father's rights to Karl were terminated, he intended "[v]ery soon" to proceed with the proceedings that were required to adopt Karl as his son.

To sum it up: Mother's argument focuses on the presumption created by the Family Code that allowing a child to remain with its parent is in the child's best interest. Yet it is equally presumed that "the prompt and permanent placement of the child in a safe environment. . . is in the child's best interest."[45] Given Mother's historical use of an illegal

---

[45] Tex. Fam. Code Ann. § 263.307(a).

substance and the fact the record contains little evidence other than Mother's belief that she has gained an awareness that her problem is serious, the trial court could reasonably infer that even if Mother's drug use is now in temporary remission, her addiction creates a condition that makes terminating her parental rights to Karl so that he may have a prompt and permanent placement in his best interest.

Because the evidence is legally and factually sufficient to support the trial court's best-interest finding, we overrule Mother's second issue.

Conclusion

First, we hold the trial court did not abuse its discretion in admitting records maintained in the regular course of business by the Texas Alcohol and Drug Testing Service under the business records exception to the hearsay rule. Next, we hold the evidence is legally and factually sufficient to support the trial court's best-interest finding. For the reasons explained above, the trial court's Order in Trial Court Cause Number CV2016063 terminating Mother's parent-child relationship is

AFFIRMED.

_____
HOLLIS HORTON
Justice

Submitted on March 2, 2023
Opinion Delivered May 25, 2023
Before Golemon, C.J., Horton and Wright, JJ.

32